[672 NYS2d 44]

The People of the State of New York, Appellant, v Stanley Traymore, John Cupak and Richard Matherson, Respondents.

First Department, April 21, 1998

**APPEARANCES OF COUNSEL**

*Susan Gliner* of counsel (*Deborah L. Morse* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Gerald M. Labush* (*Robert M. Vespoli* and *Avrom Robin* on the brief), for respondents.

### OPINION OF THE COURT

ANDRIAS, J.

On January 24, 1996, Detective John Morris of the Manhattan North Vice Enforcement Squad appeared before New York County Supreme Court Justice Herbert Adlerberg seeking permission to search apartment 3S at 18 Thompson Street in Manhattan, where the crimes of promoting gambling and possession of gambling records were allegedly being committed.

In support of his application, Detective Morris swore to an affidavit outlining his extensive law enforcement experience and describing the information and observations that led him to conclude that there was probable cause to believe that a sports gambling wireroom was being operated in that apartment.

His affidavit began by describing his nine-year law enforcement career and particularly his three-year assignment as an investigator in the Organized Crime Control Bureau's Vice Enforcement Division where he had either made or assisted in over 500 arrests involving gambling-related offenses. Based on his training in enforcing the gambling laws and his experience in the Vice Enforcement Division, Detective Morris provided a detailed description of a typical wireroom operation set up to accept wagers on sports contests or horse races.

With respect to the particulars of the Thompson Street apartment, Detective Morris indicated that an investigator from an

out-of-State District Attorney's office had informed him that an illegal sports-betting operation was being conducted in New York utilizing a certain telephone number. Subpoenaed telephone company records revealed that the subscriber to that telephone number was one "Anthony Traymore" of 18 Thompson Street, apartment 2L, and that an "additional" five telephone lines were located there.

During his ensuing investigation, Detective Morris and another detective placed a call to the specified telephone number and Morris could hear that the telephone was ringing not on the second floor but on the third floor. From his experience, Morris concluded that the telephone lines were "back-strapp[ed]", "a common practice that illegal gambling rooms utilize" to avoid detection by the police, whereby a telephone is registered to an apartment different from the one in which the telephone is actually located. A call placed to another of the telephone lines issued to apartment 2L was answered by a male voice in the third-floor apartment, outside of which Detective Morris had positioned himself and which he denominated as "3S" in his affidavit.

Detective Morris then described what he had personally heard emanating from that particular third-floor apartment on two different occasions. On the first occasion, Detective Morris heard "several" telephones ringing as well as "multiple male voices" coming from the apartment. At that time, the detective heard "at least two distinct male voices giving numerical data," which, based upon his training, he concluded to be "point spreads for sports betting." According to the detective, he heard a male voice answer a telephone and state: "Kentucky minus 14, Texas minus 6, Syracuse minus 1 and St. Joseph's minus 4". When he checked the sports section of the New York Post for that day, he discovered that the team names and point spreads he had heard corresponded to college basketball teams that were scheduled to play that day.

A week later, Detective Morris was again at the building and heard "numerous" telephones ringing and "several male voices" coming from inside the same third-floor apartment. At the time, the detective heard "more than one separate distinct male voice reciting numerical data" which, again based upon his training, he concluded to be "point spreads for sports betting". A check of the Daily News sports section for that day revealed that the team names and point spreads he overheard corresponded to three college basketball teams and one National Hockey League team scheduled to play that day.

Based upon Detective Morris's affidavit, Justice Adlerberg issued a warrant for the search of "18 Thompson Street, Apartment 3-S, third floor, Manhattan".

The next day, January 25, 1996, Detective Morris and other officers executed the warrant in a third-floor apartment at 18 Thompson Street, where the defendants were arrested while seated at telephones. In addition to $600 in cash, written and audio gambling records were recovered reflecting 11 days of entries and over $1 million in bets. Defendants were each charged with one count of promoting gambling in the first degree and 11 counts of possession of gambling records in the first degree.

All three defendants subsequently moved to controvert the search warrant, contending, *inter alia*, that the representations in the detective's supporting affidavit were false and misleading because it designated apartment "3S", a nonexistent apartment; because apartment 2L was in fact on the third floor and thus there was no "backstrapping" as alleged; and, because Detective Morris never heard any "wagers" being taken and "lines" for various sporting events are routinely and legally given out by sports services.

In a decision dated September 10, 1996, Criminal Term granted defendants' motion and suppressed all of the evidence that had been recovered pursuant to the search warrant, finding that Detective Morris's affidavit contained insufficient information to support the issuance of a search warrant and failed to "identify the premises with reasonable certainty".

We disagree and reverse accordingly.

The suppression court, while acknowledging that "applications for search warrants should not be read in a hypertechnical fashion, but rather given a common sense review" (*see, People v Tambe*, 71 NY2d 492, 501; *People v Hanlon*, 36 NY2d 549, 559), violated that standard, particularly by considering in isolation each part of Detective Morris's affidavit rather than examining the totality of the document.

As stated in *People v Hanlon* (*supra*, at 559), "[I]n the real world, we are confronted with search warrant applications which are generally not composed by lawyers in the quiet of a law library but rather by law enforcement officers who are acting under stress and often within the context of a volatile situation. Consequently such search warrant applications should not be read in a hypertechnical manner as if they were entries in an essay contest. On the contrary, they must be considered

in the clear light of everyday experience and accorded all reasonable inferences". Thus, "[w]here it appears that the Magistrate has conducted such a measured and comprehensive examination into the basis for the warrant, the factual determination as to probable cause will, of itself, constitute a suitable makeweight when the warrant is challenged" (*supra,* at 559).

It is well settled that a presumption of validity attaches to a warrant since there has already been a judicial review as to its justification (*People v Castillo,* 80 NY2d 578, 585, *cert denied* 507 US 1033; *People v Hanlon, supra,* at 558-559; *People v Ortiz,* 234 AD2d 74, 75, *lv denied sub nom. People v Cortijo,* 89 NY2d 941), thereby "simplifying the suppression court's task to determining whether the issuing Judge could reasonably have concluded that probable cause existed" (*People v Ortiz, supra,* at 75-76; *see also, People v Cabreja,* 243 AD2d 387). Moreover, "[p]robable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been or is being committed or that evidence of a crime may be found in a certain place" (*People v Bigelow,* 66 NY2d 417, 423; *see also, People v McRay,* 51 NY2d 594, 602). The determination of whether there is probable cause "is to be made after considering all of the facts and circumstances together. Viewed singly, these may not be persuasive, yet when viewed together the puzzle may fit and probable cause found" (*People v Bigelow, supra,* at 423; *see also, Illinois v Gates,* 462 US 213, 231-235).

Evaluated by these principles, it is clear that the suppression court erred when it found that the issuing Judge could not have reasonably concluded that sufficient probable cause existed to support the warrant in this case.

First, Justice Adlerberg was advised that Detective Morris, an officer with extensive experience in making gambling arrests, had ascertained that the subscriber of the telephone number supplied by the informant, which number purportedly emanated from the site of a gambling operation, was Anthony Traymore at apartment 2L, 18 Thompson Street in Manhattan, a residential location that had another five telephone lines. Furthermore, when that number was dialed, there appeared to be "backstrapping" to another (the third) floor, a common practice in illegal gambling premises.

Justice Adlerberg was also informed that Detective Morris had, on two separate dates, been stationed outside the third-

floor apartment where several telephones were ringing and heard multiple male voices giving numerical data. In the detective's expertise this was indicative of a sports-betting operation, given that the team names and point spreads that he overheard corresponded to teams that were playing on those particular days.

Justice Adlerberg, having presumably viewed the foregoing in its entirety, as required, and having applied ordinary common sense, reasonably concluded that there was sufficient probable cause to believe that gambling was taking place in the third-floor apartment for which the detective was seeking a search warrant. There is simply no basis for the suppression court's view that Justice Adlerberg was possibly misled by the third and fourth paragraphs of the detective's affidavit, which set forth general background information on illegal sports-betting operations, or that he could not judge for himself the persuasiveness of the facts relied upon to show probable cause.

The supposed "confusion" over the apartment number was not confusion on the part of the detective. The telephones registered to 2L rang on the third floor. Not only had Detective Morris conducted personal surveillance of this third-floor apartment on two different occasions, but he was present when the warrant was executed. There were only two apartments on each floor and, it should be noted, nowhere in the defendants' submissions controverting the search warrant do they state that the door to the third-floor apartment searched actually had on it the number and letter "2L"; they merely aver that the landlord "designated" the apartment "2L" and that the telephone company billed for telephones in apartment 2L. It. is undisputed that the apartment "designated 2L" is located on the third floor of the premises and therefore it is not surprising that the telephones were overheard ringing on the third floor. The detective's utilization of "3S" (possibly 3 South) in his affidavit was a logical conclusion. In fact, using the American system of numbering floors, which designates the ground floor as the first floor, as opposed to the European system, which designates the second story as the first floor, it was a more accurate description of the actual *physical location* of the subject apartment than the landlord's "designation" 2L. Even the suppression court recognized that Detective Morris was "most likely situated in front of apartment 2L, located on the third floor of the premises" and that "the confusion in the apartment numbers, in and of itself, would not be sufficient to invalidate the warrant".

Given his observations, it would have been virtually impossible for Detective Morris to have been mistaken about the apartment that was to be searched, and any mischaracterization of the number of the apartment in question clearly occurred because, although designated by the landlord as "2L", it was located on the third rather than the second floor.

Accordingly, the order of the Supreme Court, New York County (Budd Goodman, J.), entered on or about September 10, 1996, which, to the extent appealed from, granted defendants' motions to controvert the search warrant and suppress the evidence seized, should be reversed, on the law, the motions denied and the matter remanded for further proceedings.

MILONAS, J. P., NARDELLI and WALLACH, JJ., concur.

Order, Supreme Court, New York County, entered on or about September 10, 1996, reversed, on the law, to the extent appealed from, defendants' motions to controvert the search warrant and suppress the evidence seized denied, and the matter remanded for further proceedings.